Susan B. Hersh
State Bar No. 09543925
SUSAN B. HERSH P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
Ph. (972) 503-7070
Fax (972) 503-7077
susan@susanbhershpc.com
Proposed Counsel for Debtor

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---------------------------------------------------------- x

| | | |
|---|---|---|
| *In re:* | § | |
| | § | Chapter 11 |
| | § | |
| AAC Holding Corp., | § | Case No. 21– 30057-hdh-11 |
| | § | |
| Debtor.[1] | § | **Hearing to be Requested** |
| | § | |

---------------------------------------------------------- x

## DEBTOR'S MOTION FOR AN ORDER (I) AUTHORIZING DEBTOR TO (A) OBTAIN POSTPETITION SENIOR SECURED FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF

AAC Holding Corp. (the "Debtor") by and through its undersigned counsel, hereby

moves this Court for entry of an order, substantially in the form attached hereto as **Exhibit A** (the

"Proposed Order" or "DIP Order"):  (i) authorizing the Debtor to (a) obtain DIP Financing (as

defined herein) and (b) use cash collateral pursuant to section 363 of the Bankruptcy Code, (ii)

providing adequate protection to the Prepetition Secured Parties (as defined herein) pursuant to

sections 105, 361, 362, 363, 364, and 507(b) of the Bankruptcy Code, (iii) granting liens and

providing superpriority administrative expense claims in connection with the DIP Financing (as

defined herein) pursuant to sections 105, 361, 362, 363(b), and 364 of title 11 of the United States

---

[1]    The Debtor's mailing address is 1550 W. Mockingbird Lane, Dallas, TX 75235.

Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), (iv) modifying the automatic stay, and (v) granting related relief. In support of this motion (the "Motion"), the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1. The Debtor is a holding company. Its asset is the equity of American Achievement Corporation ("AAC", and together with its affiliates and the Debtor, the "Company"), a leading publisher of yearbooks, manufacturer and direct marketer of scholastic and graduation products, including jewelry, apparel, and affinity products, and provider of graduation commencement services, including professional graduation photography services, to the scholastic (K-12), collegiate, and associated alumni markets.

2. Despite the Company's core operating strengths, the COVID-19 pandemic has adversely impacted the Company's operations and cash flows, which are directly linked to activities restricted by the pandemic. Since their involvement with the Company in 2015, PCP and Falcon have been staunch supporters of the Company, injecting it with over $282 million since that time. However, as further delineated in Petitioning Creditors' Statement, in which the Debtor joins, the Prepetition Secured Parties have taken predatory and short-sighted actions that take advantage of pandemic-related disruptions to the Company in what the Debtor and the Petitioning Creditors each believe is an attempt to take ownership of the Debtor's asset based on an inappropriately depressed valuation, to the detriment of the Debtor and its other stakeholders. In fact, the Prepetition Secured Parties have already acted to divest the Debtor of its control over its sole asset: its equity in AAC. Accordingly, the Debtor has sought bankruptcy protection to create a forum for the fair treatment of all of its stakeholders, including a full, fair, independent, and open

---

[2] Capitalized terms in this section, unless otherwise defined, have the meaning used in the remainder of this Motion.

process to determine the value of the Debtor and its subsidiaries. In line with their steadfast support for the Company, the Petitioning Creditors have stepped up to offer the Company liquidity to fund its business in the ordinary course while these cases play out. Specifically, subject to the terms and conditions set forth in the DIP Term Sheet, the Petitioning Creditors are prepared to provide $35 million of superpriority DIP Financing, and have agreed to subject their offer of DIP Financing to any better offers that may come available to the Debtor and its affiliates. Due to PCP and Falcon's deep commitment to the success of the Company, and in an effort to prevent the Prepetition Secured Parties from divesting the Debtor, the Petitioning Creditors, and other stakeholders in these cases from the significant value of the Debtor and its subsidiaries, the Petitioning Creditors have offered this financing on highly-favorable terms that are a departure from "market" practice. The availability of DIP Financing will help provide the Company with sufficient liquidity such that vendors, sales representatives, and other crucial business partners can remain unimpaired by the bankruptcy process.

3. The advantages of this DIP Facility can hardly be overstated. As stated, the financing is completely subject to better offers from other parties. Among other company-favorable features are, a low interest rate (1% *per annum*), no fees, no milestones and case controls, and no financial covenants. With the availability of the DIP Facility to the Company, the Company will have considerable flexibility to restructure following a full and fair valuation process without having to take on the additional costs that normally accompany post-petition financing. As such, it will be able to chart a path for the benefit of all stakeholders as well as have its liquidity needs met.

4. As contemplated by the DIP Term Sheet attached hereto as **Exhibit B**, the Debtor is seeking authority to enter into a DIP Facility as borrower, with its subsidiaries (against

which involuntary chapter 11 petitions have been filed) guaranteeing the facility on a superpriority secured priming basis.  As such, the approval and funding of this facility must occur in stages: in this chapter 11 case and also in the chapter 11 cases of the involuntary debtors, subject, of course, to orders for relief being entered in those cases.  Additionally, given the corporate governance irregularities that the Prepetition Secured Parties have caused in connection with their recent enforcement actions, a condition precedent to closing on the DIP Facility is the replacement of the existing boards of the Debtor's subsidiaries with two independent directors that are acceptable to the DIP Lenders and the Prepetition Secured Parties.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The Debtor confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### A.      General

6.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  The Debtor is operating its businesses and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in this Chapter 11 Case, and no committees have been appointed or designated.

7. Contemporaneously with the filing of the Debtor's voluntary petition, Prudential Capital Partners IV, L.P., Prudential Capital Partners Management Fund IV, L.P., Prudential Capital Partners (Parallel Fund) IV, L.P. (collectively, "PCP"), and Falcon Strategic Partners IV, LP ("Falcon" and together with PCP, the "Petitioning Creditors") have filed involuntary petitions under chapter 11 of the Bankruptcy Code (the "Involuntary Petitions") against AAC; Commemorative Brands, Inc.; Taylor Publishing Company; Iconic Group, Inc.; Taylor Senior Holding Corp.; TP Holding Corp.; Taylor Manufacturing Holdings, LLC; Taylor Publishing Manufacturing, L.P.; CBI North America, Inc.; Gaspard Ltd.; University Cap and Gown Co., Inc.; Willsie Cap & Gown LLC; Braddock Holding LLC; Gaspard & Sons, Inc.; Gaspard and Sons Mayaguez Inc. (collectively, the "Involuntary Debtors"). The Debtor is a holding company for the Involuntary Debtors.

8. A detailed description surrounding the facts and circumstances of this Chapter 11 Case is set forth in the *Statement of Petitioning Creditors in Support of Involuntary Chapter 11 Petitions* (the "Petitioning Creditors' Statement").

**B.** **Prepetition Indebtedness**

9. As of the Petition Date, the Debtor had approximately $339 million in defaulted secured debt outstanding as guarantor under a term loan facility and revolving credit facility. In addition, the Debtor had approximately $124 million in defaulted unsecured debt outstanding as guarantor under senior subordinated notes.

**i.** **Prepetition OpCo Credit Facility**

10. In September 2015, the Company, on a consolidated basis, completed a recapitalization and refinancing of its outstanding debt and equity. In connection with the refinancing and recapitalization, AAC, Commemorative Brands, Inc., and Taylor Publishing Company, as borrowers, and the Debtor and its other domestic subsidiaries, as guarantors, entered

into a new senior secured credit facility that, as of the Petition Date, was in an amount of up to $355 million (the "OpCo Credit Facility"), and was originally scheduled to mature on September 30, 2020.[3] The OpCo Credit Facility currently consists of a revolving line of credit in an amount of up to $25 million (including a subfacility for letters of credit not to exceed $5 million) (the "OpCo Revolving Credit Facility"), which has not be drawn as of the Petition Date, and a term loan in the amount of $330 million (the "OpCo Term Loan"). Obligations under the OpCo Credit Facility are secured by substantially all assets of the Company, are subject to various financial covenants, and are subjected to certain prepayment requirements as set forth in that certain Financing Agreement, dated as of September 30, 2015, by and among the Debtor, AAC, the other borrowers and guarantors thereunder, and the lenders from time to time party thereto (as amended, restated, supplemented, modified, or otherwise changed from time to time, the "Prepetition Financing Agreement").

11. In May 2019, PCP and Falcon merged Iconic Group, Inc. into AAC (the "Iconic Merger"), and in connection with the Iconic Merger, American Achievement Group Holding Corp. amended the terms of the OpCo Credit Facility. In connection with the amendment, the lenders under the Prepetition Financing Agreement (the "Prepetition Lenders") increased the OpCo Term Loan borrowing by $30 million, increased the availability under the OpCo Revolving Credit Facility from $25 million up to $30 million (including any letters of credit not to exceed $8 million), and extended the maturity date through September 30, 2022.

12. In November 2019, the Company again amended and restated the OpCo Credit Facility to allow for additional term loan borrowings of $30 million and reducing the availability under the line of credit from $30 million to $25 million.

---

[3] Each of the Involuntary Debtors is an obligor under the Credit Facility.

13. As of the date hereof, the amount outstanding under the OpCo Term Loan is approximately $339 million.

**ii. Prepetition OpcCo Subordinated Notes**

14. In 2015, pursuant to a securities purchase agreement (as amended from time to time, the "Prepetition Securities Purchase Agreement"), AAC, Iconic Group, Inc., Taylor Publishing Company, and Commemorative Brands, Inc. (the "OpCo Subordinated Notes Issuers"), each of which are Involuntary Debtors, issued $65 million of unsecured 14 percent senior subordinated notes (the "OpCo Subordinated Notes" and the claims in respect thereof, the "OpCo Subordinated Notes Claims") to PCP and Falcon.[4]  In addition to being guaranteed by the OpCo Credit Facility Guarantors (including the Debtor), the OpCo Subordinated Notes are also guaranteed by AAC Iconic Holdings LLC, AAC Iconic Intermediate Holdings LLC, American Achievement Group Holding Corp., American Achievement Intermediate Holding Corp., and AAC Group Holding Corp.[5]  Initially, the OpCo Subordinated Notes were to mature on March 30, 2021 and bore an interest rate of 14 percent per annum.

15. As stated above, in May 2019, in connection with the Iconic Merger, the Company modified the terms of its outstanding OpCo Subordinated Notes.  As a result, the applicable interest rate was reduced to 8 percent, all of which is paid-in-kind and added to the outstanding principal amount of the debt.  The maturity date was also extended to September 30, 2023.  PCP and Falcon

---

[4]   The OpCo Subordinated Notes Issuers are the borrowers under the OpCo Credit Facility, with the exception of Iconic Group, Inc. which is a OpCo Subordinated Notes Issuer but a guarantor under the OpCo Credit Facility.

[5]   While the initiation of this Chapter 11 Case by the Debtor, as a guarantor of the OpCo Subordinated Notes, constitutes an Event of Default (as defined the Prepetition Securities Purchase Agreement) in respect of the notes, such an Event of Default does not cause the automatic acceleration of the OpCo Subordinated Notes which, in turn, automatically cross-accelerate the holding companies' obligations (the Subordinated HoldCo Term Loan and the Subordinated HoldCo Notes).  Such acceleration requires the direction of the Required Holders (as defined in the Prepetition Securities Purchase Agreement) and as of the date hereof, these obligations have not been accelerated.  Accordingly, the holding companies (with the exception of the Debtor) have not sought bankruptcy protection at this time.

hold 100 percent of the OpCo Subordinated Notes. As of the date hereof, approximately $124 million of OpCo Subordinated Notes are issued and outstanding.

## RELIEF REQUESTED

16. By this Motion, and pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507(b) of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Bankruptcy Rules, the Local Bankruptcy Rules for the Northern District of Texas (the "Local Rules") and the United States Bankruptcy Court for the Northern District of Texas Procedures for Complex Chapter 11 Cases, the Debtor seeks entry of the DIP Order granting the following relief:[6]

A. authorization for the Debtor (the "Borrower") to obtain secured debtor-in-possession financing (the "DIP Financing"), which shall be unconditionally guaranteed, on a joint and several basis, by the direct and indirect subsidiaries of Borrower specified on **Exhibit C** hereto (each a "Guarantor" and collectively, the "Guarantors"; the Guarantors collectively with the Borrower, the "Loan Parties"), consisting of a superpriority senior secured multi-draw term loan credit facility (the "DIP Facility"), in an aggregate principal amount of up to $35 million (the "DIP Commitments"), all on the terms and conditions set forth in the Proposed Order and the DIP Documents (as defined below);

B. authorization for the Borrower to execute and enter into a Superpriority Senior Secured Debtor-in-Possession Credit Agreement (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP

---

[6] Capitalized terms used in this section, unless otherwise defined, have the meaning given such terms in the DIP Order.

Credit Agreement" and, together with the schedules and exhibits attached thereto and all agreements, documents, instruments and/or amendments executed and delivered in connection therewith, collectively, the "DIP Documents"), among the Borrower, the Guarantors, the lenders from time to time thereto (collectively, the "DIP Lenders"), and the administrative agent with respect thereto (the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties"), which shall reflect the terms specified in the term sheet attached hereto as **Exhibit B** (the "DIP Term Sheet")[7] and the other DIP Documents and to perform all such other and further acts as may be required in connection with the DIP Facility and the DIP Documents;

C. the granting of adequate protection to Cerberus Business Finance, LLC, in its capacity as collateral agent (the "Prepetition Collateral Agent") for the benefit of the Prepetition Lenders (Prepetition Lenders, together with the Prepetition Collateral Agent, the "Prepetition Secured Parties") of the loans and other obligations under the Prepetition Financing Agreement, by and among the Borrower, the guarantors party thereto, the Prepetition Collateral Agent and PNC Bank, National Association, as administrative agent (the "Prepetition Administrative Agent" and, together with the Prepetition Collateral Agent, the "Prepetition Agents");

D. subject to the restrictions set forth in the DIP Documents and the Proposed Order, authorization for the Debtor to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which any of the Prepetition Secured Parties have an interest and the granting of adequate protection to the Prepetition

---

[7] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Term Sheet.

Secured Parties with respect to, *inter alia*, such use of Cash Collateral and the other

Prepetition Collateral;

E. the granting of superpriority claims pursuant to section 364(c)(1) of the Bankruptcy

Code to the DIP Secured Parties as well as liens, including priming liens, pursuant to

section 364(d) of the Bankruptcy Code, as further described herein, on all prepetition

and postpetition property of the Debtor's estate and all proceeds thereof (including any

Avoidance Proceeds (as defined below)); and

F. modification of the automatic stay to the extent set forth in the Proposed Order and in

the DIP Documents.

### Summary Terms of the DIP Facility[8]

17.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d), the following is a concise

statement and summary of the proposed material terms of the DIP Facility, as specified in the DIP

Documents and the DIP Order:

| Term | Summary |
|---|---|
| **Borrower**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | AAC Holding Corp. |
| **Guarantors**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Borrower's existing and future, direct and indirect wholly-owned subsidiaries that are Involuntary Debtors.  All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors |
| **DIP Lenders**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Funds and/or accounts managed, advised or controlled by Prudential Capital Partners and Falcon Investment Advisors, LLC or subsidiaries, affiliates, managed accounts, or limited partners of any of the foregoing |
| **DIP Agent**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | To be selected by the DIP Lenders |
| **DIP Facility**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | A non-amortizing multiple-draw superpriority senior secured priming term loan facility, in an aggregate principal amount not to exceed $35,000,000 (the loans under the DIP Facility, the "DIP Loans").  The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed. |

---

[8]     The following summary is included for convenience only and is qualified in its entirety by reference to the definitive DIP Documents, which shall control in the event of any inconsistency.  Capitalized terms used in this summary, unless otherwise defined in the Motion, have the meanings used in the applicable DIP Financing Documents.

| Term | Summary |
|---|---|
| **Interest Rate**<br>Fed. R. Bankr. P. 4001(c)(1)(B); | All amounts outstanding under the DIP Facility will bear interest at 1.00% *per annum*.<br><br>Interest on all DIP Loans will be paid in cash on a monthly basis in arrears.<br><br>After the occurrence and during the continuance of an event of default, all overdue amounts will bear interest at a rate equal to 1.00% *per annum, plus* the otherwise applicable rate. |
| **Maturity Date / Termination Date**<br>Fed. R. Bankr. P. 4001(c)(1)(B); | All DIP Obligations (as defined below) will be due and payable in full in cash on the earliest of<br>    (i) the date that is 18 months after the Closing Date; (ii) the effective date of any chapter 11 plan for the Borrower or any other Debtor;<br>    (iii) the consummation of any sale or other disposition of all or substantially all of the assets of the DIP Loan Parties pursuant to Bankruptcy Code section 363; and<br>    (iv) the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance with the DIP Documents (such earliest date, the "DIP Termination Date"). |
| **Conditions Precedent to Closing**<br>Fed. R. Bankr. P. 4001(c)(1)(B) | Limited to the following: (i) entry of orders for relief in form and substance reasonably satisfactory to the DIP Lenders holding more than 50% of the aggregate outstanding DIP Commitments and DIP Loans of the DIP Lenders (the "Required Lenders") against the Debtor subsidiaries of the Borrower pursuant to section 303 of the Bankruptcy Code; (ii) execution and delivery by each of the DIP Loan Parties of a credit agreement and other DIP Documents evidencing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and otherwise reasonably acceptable to the Required Lenders; (iii) all required approvals for the use of the Prepetition Secured Parties' cash collateral (the "Cash Collateral") on a consensual or non-consensual basis having been obtained by the DIP Loan Parties (including the Involuntary Debtors); (iv) entry of the DIP Order; (v) the replacement of the existing boards of the Borrower's subsidiaries with two independent directors that are acceptable to the DIP Lenders and the Prepetition Secured Parties; and (vi) all fees and expenses (including, without limitation, legal fees and expenses) payable under the DIP Documents or otherwise to be paid to the DIP Agent or the DIP Lenders on or before the Closing Date shall have been paid.<br><br>(a) "Prepetition Secured Documents" means (i) the Prepetition Financing Agreement") (ii) all "Loan Documents" under, and as defined in, the Prepetition Financing Agreement. The "Secured Parties" under, and as defined in, the Prepetition Secured Documents are referred to as the "Prepetition Secured Parties", and the "Collateral" under, and as defined in, the Prepetition Secured Documents is referred to as the "Prepetition Collateral". |

| Term | Summary |
|---|---|
| **Events of Default**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | Limited to the following: non-payment of obligations (subject, in all cases other than principal, to customary grace periods), defaults under covenants (subject to customary grace periods), the making of representations and warranties that are incorrect in a material respect when made, post-petition or unstayed judgment defaults, invalidity (or asserted invalidity by any of the DIP Loan Parties) of collateral documents or any other DIP Documents, dismissal or conversion of the voluntary or involuntary cases, termination or modification of the DIP Order, cross-default to post-petition or unstayed indebtedness, failure of the DIP Agent and DIP Lenders to be perfected in any material portion of the DIP Collateral with the priority described herein or granting of senior or *pari passu* liens or superpriority claims other than as described herein. |
| **Remedies** | The DIP Agent (acting at the direction of the Required Lenders) shall have customary remedies, including, without limitation, the right (after providing ten (10) business days' prior notice to counsel to the Debtor), to realize on all DIP Collateral, including DIP Cash Collateral.<br><br>The automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated on the DIP Termination Date, without further notice or order of the Court, unless the DIP Agent (at the direction of the Required Lenders) elects otherwise in a written notice to the Debtor, and the DIP Agent (at the direction of the Required Lenders) shall be permitted to exercise all rights and remedies, including with respect to the DIP Collateral, set forth in the DIP Order, and the DIP Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise. |
| **Carve-Out**<br>Fed. R. Bankr. P.<br>4001(c)(1)(B) | The "Professional Fee Carve-Out" shall be usual and customary for similar debtor-in-possession financings and shall be in an amount equal to: (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee; (ii) all reasonable fees and expenses incurred by a chapter 7 trustee under section 726(b) of the Bankruptcy Code in an amount not to exceed $50,000; and (iii) to the extent allowed by the Court at any time, whether before or after delivery of a Trigger Notice: (A) all paid and unpaid claims for fees, costs, disbursements and expenses of professionals (collectively, the "Professional Fees") whose retention is approved by the Court pursuant to section 327 of the Bankruptcy Code (the "Professional Persons") incurred at any time on or prior to the delivery of a Trigger Notice, plus (B) Professional Fees incurred after the delivery of a Trigger Notice in an amount not to exceed $1,500,000 (the "Professional Fee Carve-Out Cap"). "Trigger Notice" shall mean a written notice delivered by the DIP Agent describing the event of default that is alleged to continue under the DIP Documents. So long as the Trigger Notice shall not have been delivered, the Professional Fee Carve-Out Cap shall not be reduced by the payment of Professional Fees allowed at any time by the Court.<br><br>Immediately upon delivery of a Trigger Notice, the Debtor shall be required to deposit, in a segregated account not subject to the control of the DIP Agent (the "Professional Fee Carve-Out Account"), an amount equal to the Professional Fee Carve-Out Cap. The funds on deposit in the Professional Fee Carve-Out Account shall be available only to satisfy obligations benefitting from the Professional Fee Carve-Out, and the DIP Agent (on behalf of itself and the DIP Lenders) (i) shall not sweep or foreclose on cash of the Debtor necessary to fund the Professional Fee Carve-Out Account and (ii) shall have a security interest upon any residual |

| Term | Summary |
|---|---|
| | interest in the Professional Fee Carve-Out Account available following satisfaction in cash in full of all obligations benefitting from the Professional Fee Carve-Out. |
| **Priority and Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(i) | All obligations of the Borrowers and the Guarantors to the DIP Lenders and to the DIP Agent, including, without limitation, all principal, accrued interest and costs (collectively, the "<u>DIP Obligations</u>"), shall be secured pursuant to Bankruptcy Code section 364(c)(2) or section 364(d), as applicable, by a valid, binding, continuing, enforceable, fully perfected, non-avoidable, automatically and properly perfected first-priority senior priming lien on, and security interest in (such liens and security interests, the "<u>DIP Liens</u>"), all present and after acquired property (whether tangible, intangible, real, personal or mixed) of the DIP Loan Parties, wherever located, including, without limitation, all accounts, inventory, equipment, capital stock in subsidiaries, and the proceeds thereof, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof, including any proceeds of causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law and proceeds of all other causes of action (all such property, the "<u>DIP Collateral</u>"), which DIP Liens shall be senior to any and all other liens and security interests, including the adequate protection liens granted under the DIP Order, and the liens of the Prepetition Secured Parties, other than (i) the Professional Fee Carve-Out, and (ii) the perfected and unavoidable liens senior to the liens of the Prepetition Collateral Agent on the Prepetition Collateral. Perfection actions shall be taken in a manner to be mutually agreed.<br><br>The DIP Obligations shall also constitute claims entitled to the benefits of Bankruptcy Code section 364(c)(1), having a super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever and the administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503, 506, 507(a), 507(b), 546, 552, 726, 1113 and 1114, and any other provision of the Bankruptcy Code ("<u>DIP Claims</u>"), subject only to the Professional Fee Carve-Out. |
| **Use of DIP Proceeds and Cash Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii) | The proceeds of the DIP Loans made by the DIP Lenders will be used by the Borrower only for the following payments: (i) working capital and other general corporate purposes of the DIP Loan Parties, including payments to vendors and independent sales representatives in the ordinary course of business; and (ii) professional fees and expenses of administering the voluntary and involuntary cases. |
| **Adequate Protection / Identity of Each Entity with Interest in Cash Collateral**<br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii); (b)(1)(B)(i), (iv) | Pursuant to Sections 361 and 363(e) of the Bankruptcy Code, as protection in respect of (x) the incurrence of the DIP Facility; (y) the imposition of the automatic stay; and (z) the Debtor' use of the Prepetition Collateral including Cash Collateral, the Debtor and the DIP Lenders agree, subject to Court approval, to the following forms of adequate protection (the "<u>Adequate Protection</u>"):<br><br>(a) for the benefit of the Prepetition Secured Parties, to the extent of diminution in value of their collateral, as provided in the Bankruptcy Code, replacement or, if applicable, new continuing, valid, binding, enforceable, non-avoidable and automatically perfected post-petition |

| Term | Summary |
|---|---|
| | security interests in and liens on the DIP Collateral pursuant to sections 361 and 363(e) of the Bankruptcy Code that shall be junior only to the DIP Liens; |
| | (b) for the benefit of the Prepetition Secured Parties, to the extent of diminution in value of their collateral, as provided in the Bankruptcy Code, allowed superpriority claims as provided for in sections 503(b) and 507(b) of the Bankruptcy Code that are junior only to the superpriority claims of the DIP Lenders; and |
| | (c) for the benefit of the Prepetition Secured Parties, financial reporting and other reports and notices delivered by the Borrower under the DIP Facility. |
| **Waiver or Modification of the Automatic Stay** Fed. R. Bankr. P. 4001(c)(1)(B)(iv) | Waiver of the automatic stay to permit the DIP Agent and the DIP Lenders to enforce all of their rights under the DIP Documents and, subject to the terms of the DIP Documents, (i) immediately upon the occurrence of an Event of Default, declare upon notice to the Debtor (A) the termination, reduction or restriction of any further DIP Commitment to the extent any such DIP Commitment remains and (B) all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtor, other than as required under the DIP Documents, and (ii) upon the occurrence of an Event of Default and the giving of ten (10) business days' prior written notice (which shall run concurrently with any notice required to be provided under the DIP Documents) via email to counsel to the Debtor, counsel to any official committee of unsecured creditors appointed in connection with the Chapter 11 Case, and the U.S. Trustee to (A) withdraw consent to the Debtor's continued use of Cash Collateral and (B) exercise all other rights and remedies provided for in the DIP Documents and under applicable law. |
| **Milestones** Fed. R. Bankr. P. 4001(c)(1)(B)(vi) | None |
| **Indemnification** Fed. R. Bankr. P. 4001(c)(1)(B)(ix) | The DIP Documents will contain provisions for payment of reasonable and documented out-of-pocket expenses and indemnification of the DIP Agent and the DIP Lenders, including reimbursement for (i) counsel for the DIP Agent and (ii) a financial advisor and counsel for the DIP Lenders. |
| **Section 506(c) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B)(x) | None |
| **Liens on Avoidance Actions** Fed. R. Bankr. P. 4001(c)(1)(B)(xi) | None |
| **Section 522(b) Waiver** Fed. R. Bankr. P. 4001(c)(1)(B) | None |

## BASIS FOR RELIEF[9]

### I.   The Debtor Should Be Authorized to Obtain the DIP Facility Under Section 364 of the Bankruptcy Code

18.   The Debtor will satisfy the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain postpetition financing and, in return, to grant superpriority administrative claim status and liens on their property.   Section 364(c) of the Bankruptcy Code establishes the conditions under which a debtor may obtain certain types of secured credit and provides, in pertinent part, as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
>> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code];
>>
>> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>>
>> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).  Further, section 364(d) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
>> (A) the trustee is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

---

[9]   In advance of a hearing on the Motion, the Debtor intends to advance evidence in support of the Motion and in support of entry into the DIP Facility.

11 U.S.C. § 364(d).

19.     As long as a debtor's business judgment does not run afoul of the letter and spirit of the Bankruptcy Code, courts grant a debtor considerable deference in exercising its sound business judgment in obtaining such credit. *See, e.g., In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment").

20.     Further, in determining whether the Debtor has exercised sound business judgment in deciding to enter into the DIP Documents, the Court may appropriately take into consideration non-economic benefits to the Debtor offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be

> a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

21. Here, given all the facts and circumstances present in this case, as will be shown, the Debtor will amply satisfy the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Facility. Given the multitude of company-friendly features of the DIP Facility, and the fact that the DIP Facility is subject to any better financing offers that may be provided to the Debtor and its subsidiaries, the Debtor exercised proper business judgment in securing the DIP Facility on terms that are fair and reasonable and the best available to them under the circumstances. The Court should grant the Debtor's request to enter into the DIP Facility pursuant to sections 364(c) and (d) of the Bankruptcy Code.

### A. The Debtor Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Facility

22. Based on the circumstances of this Chapter 11 Case, the DIP Facility represents a proper exercise of the Debtor's business judgment. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including decisions about whether and how to borrow money. *See, e.g., Grp. of Institutional Investors v. Chi., Milwaukee, St. Paul & Pac. R Co.*, 318 U.S. 523, 550 (1943); *Farmland Indus.*, 294 B.R. at 882 ("Business judgments should be left to the board room and not to this Court.") (quoting *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985)); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

23. In general, a bankruptcy court defers to a debtor's business judgment regarding the need for, and the proposed use of, funds, unless the debtor's decision improperly leverages the bankruptcy process or its purpose is not so much to benefit the estate as it is to benefit a party in interest. *See Ames Dep't Stores*, 115 B.R. at 40; *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).

24. Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied as long as the proposed action appears to enhance the debtor's estate. *See In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"). Under the business judgment rule, "management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code." *Farmland Indus.*, 294 B.R. at 881 (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985) and *In re Defender Drug Stores, Inc.*, 145 B.R. at 317.

25. Here, the Debtor has exercised sound business judgment in determining that the DIP Facility is appropriate. Importantly, entry into, and the funding of, the DIP Facility are expressly conditioned upon the appointment of independent directors to each of the Guarantor subsidiaries. Those directors would be required to approve the DIP Facility in the exercise of their independent business judgment prior to the DIP Facility becoming effective. The DIP Facility has a litany of company-friendly features and will help the Debtor and its subsidiaries to finance their operations through these chapter 11 cases.

26.     For all of these reasons, the Debtor determined that entry into the DIP Facility is in the best interests of the Debtor, its estate and its creditors.  The DIP Facility will provide the Debtor with access to the liquidity needed to preserve the value of its asset. Accordingly, the Debtor's decision to enter into the proposed DIP Facility, subject to the separate approval of independent directors to be appointed to the boards of its subsidiaries, is an exercise of its sound judgment that warrants approval by the Court.

**B.     The Debtor Will Satisfy the Conditions Necessary Under Section 364(c) to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

27.     Section 364(c) of the Bankruptcy Code authorizes a debtor to obtain postpetition financing on a secured or superpriority basis, or both, where the Court finds, after notice and a hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] . . . ."  11 U.S.C. § 364(c).

28.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(i)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

(ii)    the credit transaction is necessary to preserve the assets of the estate; and

(iii)   the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*See, e.g., In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above factors and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's

estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere").

### (i) The Debtor Is Unable to Obtain Financing on More Favorable Terms than the DIP Facility

29. A debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."); *accord Ames Dep't Stores*, 115 B.R. at 37 (debtor must show that it has made reasonable efforts to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). This is true especially when "time is of the essence." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). When few lenders are likely able and willing to extend the necessary credit, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

30. Here, the terms of this DIP Facility are highly advantageous for the Debtor and, as will be shown, no financing would be reasonably available to the Debtor or its subsidiaries on an unsecured or junior secured basis, particularly on the terms offered by the DIP Lenders. Not only are the DIP Lenders seeking no fees in connection with the DIP Facility, but the Debtor will

not be burdened with milestones or other case controls. Moreover, the interest rate is only 1.00% *per annum*, making this DIP Facility extremely inexpensive for the Debtor. These unique terms provide the Debtor a very valuable opportunity to maximize value in a restructuring without having to take on the additional costs that normally accompany post-petition financing. The DIP Facility's terms, on their own, evidence that the Debtor will likely be unable to obtain financing more favorable than that offered by the DIP Lenders.

### (ii)     The DIP Facility Is Necessary to Preserve the Asset of the Estate

31.     It is essential that the Debtor obtains the proposed financing to continue the orderly operation of its businesses to preserve their going-concern value pending completion of the plan process.  As discussed above, absent the financing to be provided by the DIP Facility, the Debtor's businesses will suffer harm resulting from substantially diminished available liquidity, impairing the Debtor's ability to successfully implement the transactions contemplated by the Plan. Accordingly, the circumstances of this Chapter 11 Case necessitates postpetition financing under section 364(c) of the Bankruptcy Code.  *See Burtch v. Ganz (In re Mushroom Transp. Co., Inc.)*, 382 F.3d 325, 339 (3d Cir. 2004) (observing that a debtor in possession has a fiduciary duty to "protect and maximize" the value of its estate).

### (iii)     Terms of the DIP Financing Are Fair, Reasonable, and Appropriate Under the Circumstances

32.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *Farmland Indus.*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n. 7(W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).  The appropriateness of a proposed financing facility should also be considered in light of current

market conditions. *See Transcript of Record* at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

33.     Here, the terms of the DIP Facility are extremely fair, appropriate, reasonable, and in the best interests of the Debtor, its estate, and its creditors.  The terms of this DIP Facility are highly favorable to the Debtor. Unlike nearly all postpetition credit facilities, the DIP Lenders are not seeking any fees in connection with the DIP Facility, and the Debtor will not be burdened with restrictive milestones or other case controls. The interest rate of the DIP Facility is only 1.00% *per annum*. These terms provide ample flexibility for the Debtor to maximize value through addressing the pressing liquidity needs of the Company.

### C.     The Debtor Will Satisfy the Requirements for Obtaining Credit Under Section 364(d) of the Bankruptcy Code

34.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, a court may also authorize a debtor to obtain postpetition credit secured by a lien that is senior in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected or consent is obtained. *See* 11 U.S.C. § 364(d)(1).

35.     When determining whether to authorize a debtor to obtain credit secured by a lien that is senior or equal to a prepetition lien under section 364(d), courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's businesses;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arms'-length  and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g., Ames Dep't Stores*, 115 B.R. at 37-39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862-79; *Barbara K. Enters.*, 2008 WL 2439649, at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed.).

36.     *First*, the terms provided in this DIP Facility will be subject to more favorable offers by third-party lenders.

37.     *Second*, the Debtor needs the funds to be provided under the DIP Facility to preserve the value of its estate for the benefit of creditors and other parties in interest, facilitate a restructuring process, and otherwise support the Company's restructuring activities.

38.     *Third,* the terms of the DIP Facility are extremely favorable and more than adequate to support the Company's operations through the confirmation and consummation of a plan during the pendency of this Chapter 11 Case.

39.     *Fourth*, the DIP Facility is fair and reasonable under current market conditions and in light of the Debtor's financial condition.

40.     Taking into account all of these factors, the Debtor should be authorized to secure the DIP Facility as set forth in the DIP Documents and the DIP Order.

### D.      The Interests of the Prepetition Secured Parties Are Adequately Protected

41.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.   *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection

may be provided in various forms, granting of replacement liens or administrative claims. *See, e.g., In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) ("[S]uch matters 'are [to be] left to case-by-case interpretation and development.'") (quoting H.R. Rep. No. 595, 95th Cong., 2d Sess. 339, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6295); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . 'left to the vagaries of each case'"); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted). The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *See Martin*, 761 F.2d at 474; *In re Johnson*, 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (holding that secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); *see also* 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."); *Beker Indus. Corp.*, 58 B.R. at 736; In re Hubbard Power & Light, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

42. The Prepetition Secured Parties will be granted Adequate Protection through the provision of replacement liens, superpriority administrative claims, and prompt access to any financial reporting provided under the DIP Facility.

43. Accordingly, as will be shown, the Adequate Protection provided to the Prepetition Secured Parties is fair and reasonable, and satisfies the requirements of section 364 of the Bankruptcy Code.

## II. The Debtor Should Be Authorized to Use Cash Collateral

44. Section 363(c)(2) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2). Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

45. To the extent that the Debtor has Cash Collateral, the Debtor will satisfy the requirements of sections 363(c)(2) and 363(e), and should be authorized to use the Cash Collateral. The Debtor is providing the Prepetition Secured Parties with Adequate Protection in the form of replacement liens on the DIP Collateral, including Cash Collateral as well as the other protections described above.

46. Therefore, the Debtor submits that it should be authorized to use the Cash Collateral on the terms set forth in the DIP Order.

## III. The Scope Of The Professional Fee Carve Out Is Appropriate

47. The DIP Facility subjects the security interests and administrative expense claims of the DIP Lenders to the Professional Fee Carve-Out. Such carve-outs for professional

fees under the terms of the debtor's postpetition financing have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their professionals during a chapter 11 case, including during an event of default. *See Ames Dep't Stores*, 115 B.R. at 40. Additionally, the Professional Fee Carve-Out protects against administrative insolvency during the course of this Chapter 11 Case by ensuring that assets remain for payment of the U.S. Trustee's fees and professional fees of the Debtor and any statutory committee, notwithstanding the grant of superpriority claims and adequate protection liens.

## IV. The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e)

48. Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

49. The terms and conditions of the DIP Facility are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Documents with respect thereto, other than as described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V. Modification of the Automatic Stay Is Warranted for the DIP Secured Parties

50.     The DIP Documents contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Agent to exercise, upon the occurrence and during the continuation of any Event of Default, but subject to any applicable motion requirements in the DIP Order, all rights and remedies provided for in the DIP Documents, without further order of or application to the Court.

51.     Stay modification provisions of this sort are ordinary features of debtor-in-possession financing and, in the Debtor's business judgment, are reasonable under the circumstances. *See, e.g.*, *In re The NORDAM Group, Inc.*, Case No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018); *In re Golfsmith Int'l Holdings, Inc.*, Case No. 16-12033 (LSS) (Bankr. D. Del. Sep. 16, 2016); *In American Apparel, Inc*., Case No. 15-12055 (BLS) (Bankr. D. Del. Nov. 2, 2015); *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (Bankr. S.D.N.Y Oct. 16, 2018); *In re Westinghouse Electric Co. LLC,* Case No. 17-10751 (MEW) (Bankr. S.D.Y.Y May 26, 2017); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB) (Bankr. S.D.N.Y. August 19, 2016); *In re Aeropostale, Inc*., No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 13, 2016).

## VI. Waiver of Stay Under Bankruptcy Rule 6004(h)

52.     The Debtor also requests that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtor seeks in this Motion is necessary for the Debtor to operate its business without interruption and to preserve value for its estate. Accordingly, the Debtor respectfully request that the Court waive the 14-day stay imposed by

Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

53.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor requests (1) entry of an order substantially in the form of the proposed Order annexed hereto as **Exhibit A**; and (2) such other and further relief as is just.

SIGNED this the 14th day of January, 2021.

Respectfully Submitted,

*Susan B. Hersh*
State Bar No. 09543925
SUSAN B. HERSH P.C.
12770 Coit Road, Suite 1100
Dallas, Texas 75251
Ph. (972) 503-7070
Fax (972) 503-7077
susan@susanbhershpc.com
Proposed Counsel for Debtor

### CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served on all parties receiving ECF court notification on the date this was filed and on all parties on the attached service list by first class on January 15, 2021.

*/s/Susan B. Hersh*

28

## **Exhibit A**

Proposed Order

**Exhibit B**

DIP Term Sheet

**Exhibit C**

List of Guarantors

American Achievement Corporation

Commemorative Brands, Inc.

Taylor Publishing Company

Iconic Group, Inc.

Taylor Senior Holding Corp.

TP Holding Corp.

Taylor Manufacturing Holdings, LLC

Taylor Publishing Manufacturing, L.P.

CBI North America, Inc.

Gaspard Ltd.

University Cap and Gown Co., Inc.

Willsie Cap & Gown LLC

Braddock Holding LLC

Gaspard & Sons, Inc.

Gaspard and Sons Mayaguez Inc.